USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/16/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHANA WILLIAMS,                                  :
                                                 :
                    Plaintiff,                   :        **OPINION &**
                                                 :        **ORDER**
                                                 :
          -against-                              :        20-CV-8469 (JLC)
                                                 :
KILOLO KIJAKAZI,[1]                              :
Commissioner, Social Security Administration,    :
                                                 :
                    Defendant.                   :
                                                 :
------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Shana Williams seeks judicial review of a final determination by

defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security

Administration, denying her application for disability insurance benefits and

supplemental security income under the Social Security Act.  The parties have

cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  For the reasons set forth below, Williams' motion is

granted, the Commissioner's cross-motion is denied, and the case is remanded for

further proceedings.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this action.

# I.  BACKGROUND

## A.  Procedural History

On July 9, 2018, Williams filed for Social Security Disability benefits, alleging a disability onset date of August 30, 2017.  Administrative Record ("AR"), Dkt. No. 16, at 171.[2]  The Social Security Administration ("SSA") denied Williams' claims on September 7, 2018, and she subsequently filed a written request for a hearing before an ALJ on September 28, 2018.  *Id.* at 17.  On October 7, 2019, Williams appeared before the ALJ, as did a vocational expert  *Id.*  On November 27, 2019, the ALJ found Williams to be not disabled and denied her claims.  *Id.* at 17–29.  Williams sought review of the ALJ's decision by the Appeals Council, which denied Williams' request on August 13, 2020.  *Id.* at 1–3.

Williams timely commenced this action on October 11, 2020, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Complaint, Dkt. No. 1.  The Commissioner answered Williams' complaint by filing the administrative record on May 28, 2021.  Dkt. No. 16.  On July 27, 2021, Williams moved for judgment on the pleadings and submitted a memorandum of law in support of her motion.  Notice of Motion for Judgment on Pleadings, Dkt. No. 17; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 18.  The Commissioner cross-moved for judgment on the pleadings on September 27, 2021, and submitted a memorandum in support

---

[2] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

of her cross-motion.  Notice of Cross-Motion for Judgment on the Pleadings, Dkt.

No. 19; Memorandum of Law in Support of the Commissioner's Cross-Motion for

Judgment on the Pleadings and in Response to Plaintiff's Motion ("Def. Mem."),

Dkt. No. 20.  On October 15, 2021, Williams submitted reply papers.  Response to

Cross-Motion for Judgment on the Pleadings and in Response to Plaintiff's Motion

("Pl. Response"), Dkt. No. 21.

### B.  The Administrative Record

#### 1.  Williams' Background

Williams was born on January 6, 1977 and has a high school education.  AR

at 43.  At the time of the hearing, Williams lived in an apartment in Brooklyn with

her two sons, aged 14 and 22.  *Id*. at 14; 49–50.[3]  From 2000 to 2008, Williams

worked as a secretary for the United Federation of Teachers.  *Id*. at 43–44.  Starting

in August 2009, Williams worked as a school safety officer.  *Id*. at 43.  On August

30, 2017, she fell down the stairs at her place of employment.  *Id*. at 45–46; 279–83.

According to Williams' medical records, she tripped while walking down the stairs,

holding the banister as she fell.  *Id*. at 303.  As a result of her fall, Williams  alleges

injuries to her right wrist, right ankle, and left knee, as well as anxiety and

depression.  *Id*. at 46, 51.  Williams returned to her job as a school safety officer for

three months from March 2019 to June 2019, but left due to difficulty sitting for

long periods of time.  *Id*. at 19; 42.  Williams alleges that her injuries prevent her

---

[3] Williams' mailing address is now in Manhattan.  *Id*. at 1.

from working.  *Id.* at 171.  The Court will next summarize the relevant medical evidence.

### 2.  Relevant Medical Evidence

#### a. Treatment History

##### i. Brookdale Hospital Medical Center

Williams received treatment at the Emergency Department of Brookdale Hospital Medical Center ("BHMC") on August 31, 2017, one day after her fall.  *Id.* at 276.  Williams presented with a foot injury and received treatment for swelling in her right ankle and for left knee pain with ecchymosis.  *Id.* at 276, 282.[4]  She rated her pain at a level of 8 out of 10.  *Id.* at 280.  Williams' right ankle was splinted before discharge; she refused a splint for her left knee.  *Id.* at 282.  In Williams' discharge plan, the treating doctor recommended that she use a cane.  *Id.* at 282.

On August 12, 2019, almost two years later, Williams was treated at the Emergency Department of BHMC for atypical chest discomfort following emotional distress.  *Id.* at 765.  Williams reported shortness of breath, dizziness, and giddiness, and was noted as having a history of asthma, sarcoidosis, and anxiety. *Id.* at 765.

##### ii. Spine & Orthopaedic Rehabilitation Center

Williams was first evaluated at Spine & Orthopaedic Rehabilitation Center on September 6, 2017, where she presented wearing an ankle boot on her right foot

---

[4] Ecchymosis is a type of bruising that forms when blood leaks out of blood vessels and into the top layer of the skin.  *Ecchymosis*, WebMD, https://www.webmd.com/skin-problems-and-treatments/ecchymosis (last visited March 14, 2022).

and ambulating with a cane in her left hand. *Id.* at 301. Williams described "throbbing" pain in her right ankle at a level of 8 to 9 out of 10, pain in her left knee at a level of 7 to 8 out of 10, and sharp pain in her right wrist when turning doorknobs at a level of 6 to 7 out of 10. *Id.* Dr. Charles Kaplan prescribed physical therapy three times weekly and recommended that Williams continue to take over-the-counter Tylenol and Motrin. *Id.* at 302. Dr. Kaplan noted that Williams was "temporarily totally disabled" at the time. *Id.*

Williams returned for a follow-up evaluation on September 21, 2017 and was seen by Dr. Gianni Persich. *Id.* at 311.[5] Dr. Persich observed that Williams' gait was antalgic and that she was immobilized in a fiberglass posterior splint. *Id.* Dr. Persich further noted that Williams was still experiencing pain and swelling and that she remained "totally disabled at this time," and prescribed a fracture boot. *Id.* at 311.

On November 1, 2017, Dr. Thomas Scilaris examined Williams' right wrist, where Williams reported significant pain. *Id.* at 303. The examination showed "significant ulnur-sided pain and tenderness with dorsiflexion." *Id.*[6] According to

---

[5] Dr. Gianni Persich is a Doctor of Podiatric Medicine or "podiatrist," an expert in medicine of the feet, ankles, and other structures of the legs. *Id.* at 360; *Becoming a Podiatric Physician*, AMERICAN ASSOCIATION OF COLLEGES OF PODIATRIC MEDICINE, https://aacpm.org/becoming-a-podiatric-physician/ (last visited March 14, 2022).

[6] "Ulnur-sided" pain occurs on the outside (pinkie-finger side) of the wrist. *Ulnar Wrist Pain*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/symptoms/21035-ulnar-wrist-pain (last visited February 24, 2022). Dorsiflexion means flexing of a joint. *See Dorsiflexion*, MERRIAM-WEBSTER.COM MEDICAL DICTIONARY, https://www.merriam-webster.com/medical/dorsiflexion (last visited March 14, 2022).

Dr. Scilaris' notes, Dr. Persich had informed Williams that her right ankle injury would require surgery. *Id.* Dr. Scilaris predicted that Williams would "more than likely . . . require some crutch versus even cane ambulation," and therefore recommended waiting until after she recovered from her ankle surgery to operate on her wrist. *Id.*

Dr. Kaplan evaluated Williams again on December 6, 2017. *Id.* at 320. She reported throbbing pain in her right ankle at a level of 8 to 9 out of 10, sharp, throbbing pain in her left knee at a level of 5 out of 10, and sharp pain in her right wrist when turning doorknobs at a level of 6 to 9 out of 10. *Id.* at 320. A physical examination revealed severe tenderness of her right ankle, a cyst-like formation at the front of her left knee, and severe tenderness on palpitation around the outside of her right wrist. *Id.* at 320–21. Dr. Kaplan prescribed continued physical therapy three times weekly and the continued taking of Tylenol and Motrin, diclofenac gel, and Vicodin at night. *Id.*[7] Dr. Kaplan noted that Williams was "temporarily totally disabled" due to her injury. *Id.*

### iii. Behavioral Medicine Associates

On November 30, 2017, Williams presented for psychological evaluation at Behavioral Medicine Associates. *Id.* at 314. During a mental status examination,

---

[7] Diclofenac gel is a topical anti-inflammatory drug used to relieve arthritis pain. *Diclofenac Topical*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a611002.html (last visited March 14, 2022). Vicodin is a brand name medication that contains acetaminophen and hydrocodone (a narcotic analgesic), prescribed to relieve pain. *Hydrocodone Combination Products*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601006.html#why (last visited March 14, 2022).

Dr. Alexander Alvarado noted that Williams was calm and cooperative, but that her mood was "anxious and irritable." *Id.* at 314.  Williams reported that she could no longer turn doorknobs, complete chores, laundry, grocery shopping, or cook for her kids, and relied on help from her older son.  *Id.*  According to her psychological evaluation, Williams was:

> suffering from consequential psychological problems, including irritability, fatigue, and moodiness, loss of social interest, periods of crying and depression, appetite and sleep problems. She is anxious and fearful and has given up activities she used to enjoy. She constantly thinks about [her fall] and reports loss of libido and loss of motivation . . . . She is having a difficult time getting her basic needs met and cannot achieve her goals in important areas of life.

*Id.* at 314–15.  Consequently, Williams was diagnosed with chronic adjustment disorder with mixed anxiety and depressed mood, as well as a pain disorder with related psychological factors.  *Id.* at 317.

### iv. Brooklyn Heights Imaging

On September 6, 2017, Williams received X-Rays of her right ankle and left knee.  *Id.* at 323–24.  The X-Ray of her left knee showed tiny marginal osteophytes off the patella.  *Id.* at 324.[8]

Williams underwent an MRI of her right ankle on September 15, 2017.  *Id.* at 325.  On October 3, 2017, Williams underwent MRIs of her left knee and right wrist.

---

[8] Osteophytes, or bone spurs, are "smooth, bony growths, usually near joints" that develop in patients with joint damage. *Bone Spurs (Osteophytes)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/10395-bone-spurs-osteophytes (last visited March 14, 2022).

*Id.* at 326–27.  The MRI of her left knee showed torn cartilage in two places around her kneecap and a small cyst.  *Id.* at 326.[9]  The MRI of her right wrist showed mild inflammation and tears of her wrist tendons, mild swelling, and two ganglion cysts. *Id.* at 327.[10]

Williams received another MRI of her left knee on July 30, 2018.  *Id.* at 328. The MRI showed tears of the medial meniscus and meniscal root, swelling, and a small cyst, as well as chondral loss, defects, and fissuring around the knee. *Id.*[11]

---

[9] *See Osteochondral Lesions/Osteochondritis Dessicans*, CEDARS SINAI: HEALTH LIBRARY, https://www.cedars-sinai.org/health-library/diseases-and-conditions/o/osteochondral-lesionsosteochondritis-dessicans.html (last visited March 14, 2022); Farhad Iranpour et al., *The Geometry of the Trochlear Groove*, 468 CLIN. ORTHO. & RELATED RES. 782, 785–86 (defining the distal femur trochlear groove).

[10] *See Tenosynovitis*, MEDSCAPE, https://emedicine.medscape.com/article/2189339-overview#a1  (explaining that tenosynovitis is inflammation of a tendon and its surrounding sheath) (last updated January 6, 2021); *Joint Effusion (Swollen Joint)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/symptoms/21908-joint-effusion  (explaining that joint effusion is swelling caused by excess fluid following joint damage) (last visited March 14, 2022).  Ganglion cysts are fluid-filled, sometimes-painful lumps that commonly develop near joints after injury. *Ganglion Cysts*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15554-ganglion-cysts (last visited March 14, 2022).

[11] The medial meniscus is one of two menisci - thick bands of cartilage that stabilize and act as shock absorbers for the knee.  *Medial and Lateral Meniscus Tears*, CEDARS SINAI: HEALTH LIBRARY, https://www.cedars-sinai.org/health-library/diseases-and-conditions/m/medial-and-lateral-meniscus-tears.html (last visited March 14, 2022) [hereinafter "CEDARS SINAI: *Meniscus Tears*"].  Chondral defects are damages to the connective cartilage that lines the end of bones. *Chondral/Osteochondral Defect*, STANFORD HEALTH CARE, https://stanfordhealthcare.org/medical-conditions/bones-joints-and-muscles/chondral-osteochondral-defect.html (last visited March 14, 2022) [hereinafter "STANFORD HEALTH CARE: Chondral Defect"].

### v. Health East Ambulatory Surgical Center

On January 23, 2018, Williams underwent surgery to her right ankle and received a nerve block (an injection of local anesthetic) for post-operative pain. *Id.* at 355.[12]  On October 16, 2018, Williams received left knee arthroscopy with two partial meniscectomies, removal of a chondral defect, and extensive synovectomy. *Id.* at 341–42.[13]  On the same day, Williams received a nerve block for post-operative pain. *Id.* at 351.

### vi. Dr. Gianni Persich, DPM

Williams received additional treatment from Dr. Gianni Persich, a podiatrist. On September 13, 2017, Williams reported experiencing ankle pain for the past two or three weeks and was treated for a right ankle sprain. *Id.* at 360, 362.  Dr. Persich noted that Williams was "totally disabled" at this time. *Id.* at 362.

On November 2, 2017, Williams returned for a follow-up visit and continued to report right ankle pain. *Id.* at 366.  Dr. Persich noted that Williams "[was] not

---

[12] *Nerve Blocks*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/treatments/12090-nerve-blocks (last visited March 14, 2022).

[13] Arthroscopy is a surgical procedure in which a camera is inserted into a joint through a small incision, followed by other tools to probe or repair the joint. *Arthroscopy*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthroscopy (last visited March 14, 2022).  A meniscectomy is a surgery to repair a tear of a meniscus. *Meniscectomy for a Meniscus Tear*, University of Michigan Health, https://www.uofmhealth.org/health-library/uh2055 (last visited March 14, 2022); *see also* CEDARS SINAI: *Meniscus Tears*, *supra* note **Error! Bookmark not defined.**. *See* STANFORD HEALTH CARE: Chondral Defect *supra* note **Error! Bookmark not defined.**.  A Synovectomy is a surgery to remove scarred or dead tissue. *Synovectomy for Rheumatoid Arthritis*, UNIVERSITY OF MICHIGAN HEALTH, https://www.uofmhealth.org/health-library/aa18893 (last visited March 14, 2022).

responding to conventional treatment. She [had] not demonstrated any significant improvement," and consequently requested authorization for a right ankle surgery. *Id.* at 368; *see also id.* at 355–57. On December 14, 2017, prior to Williams' ankle surgery, Dr. Persich again observed that Williams' injury was not responding to conventional treatment and had shown no significant improvement. *Id.* at 371.

After her ankle surgery, Williams saw Dr. Persich for a post-operative visit on February 1, 2018. *Id.* 376. Williams reported that she was experiencing "some breakthrough pain." *Id.* At that time, Williams stated that she lived alone and required some assistance. *Id.* Williams returned for post-operative visits on February 15, 2018, March 8, 2018, May 10, 2018, July 27, 2018, September 21, 2018 and December 3, 2018. *Id.* at 378–85. At each of these visits, Dr. Persich noted that Williams was "totally disabled." *Id.*

On January 24, 2019, Dr. Persich reported that Williams was "cleared to return to light duty work." *Id.* at 386. Williams returned for one more post-operative visit with Dr. Persich on April 22, 2019, at which point Dr. Persich stated that she had "exhausted all treatment" and determined that "no further improvement [could] be reasonably expected." *Id.* at 388. At that time, Williams had finished physical therapy, returned to her job as a school safety officer, and had mild to moderate ankle swelling. *Id.* at 389. Her ankle was reportedly "stable in all planes," though her gait remained antalgic. *Id.*

### vii.  Livingston Physical Medicine

Williams received physical therapy treatment at Livingston Physical Medicine on a regular basis beginning on February 18, 2018 until August 21, 2019.

*Id.* at 427–67.  She was frequently treated there by Dr. Kaplan.  *Id.*  During an October 3, 2018, follow-up evaluation of her left knee, Williams complained of knee pain and having difficulty on stairs.  *Id.* at 446.  After discussing her symptoms and the fact that her impairment was not responding to a conservative treatment plan with Dr. Scilaris, Williams elected left knee arthroscopy.  *Id.* at 446.

Williams' right wrist was frequently examined in the course of her treatment at Livingston Physical Medicine.  On February 14, 2018, Williams rated her right wrist pain at a level of 6 to 9 out of 10.  *Id.* at 427.  Examination showed tenderness on palpitation and a limited mobility.  *Id.* at 428.  Over the next several months, Williams frequently reported pain in her right wrist, and during these visits her examining doctors often reported that Williams' wrist showed tenderness and limited mobility.  *See id.* at 433–35, 437, 439, 442, 450, 455, 459.  On October 2, 2018, Dr. Kaplan noted that Williams' right wrist "hurts more with repetitive use." *Id.* at 442.  On February 27, 2019, for the first time, Dr. Kaplan reported in Williams' record: "[r]ight hand sprain – resolved" and "no significant tenderness at the right wrist."  *Id.* at 462.  On June 3, 2019, Williams stated that "her right hand and right wrist [are] much improved and only gives her occasional stiffness and clicking."  *Id.* at 465.  On the same date, Dr. Kaplan reported his medical opinion that Williams had a 10% loss of motion in her right wrist.  *Id.* at 367.

Williams began complaining of lower back pain on November 14, 2018.  *Id.* at 449.  According to Physician Assistant ("P.A.") Adam Khan's notes, Williams reported pain in her lower back since her initial injury, though she did not report it

11

at the time because "her left knee and right ankle were the primary concern or injuries," but that recently "the low-back pain is traveling across her back including down to the hips into the buttocks." *Id.* at 449.  Examination of the lumbar spine revealed "palpable muscle spasms with trigger points noted . . . as well as tenderness to palpitation[.]" *Id.* at 450.  P.A. Khan reported that:

> [w]e are requesting to evaluate for prima facie medical evidence clarifying that she did injure the lumbar spine since the initial injury due to the altered gait pattern she has sustained due to the right ankle surgery and left knee surgical repair as she is putting more pressure on her back . . . and she is now having significant injuries in this area.

*Id.* at 449.

Williams reported "worsening" pain in her lower back on December 13, 2018. *Id.* at 456.  On that date, Dr. Kaplan opined that her low-back pain injury was related to her injury in August 2017.  *Id.* (opining that Williams' "altered gait caused the significant mechanical strain on the back.").  On January 16, 2019, P.A. Khan noted that Williams was "ambulating slowly, favoring the left leg, utilizing a standard cane on her right hand.  Marked difficulty with tiptoe, heel stand. Markedly [sic] difficulty with squatting." *Id.* at 459.  Examination again revealed palpable muscle spasms with trigger points and tenderness to palpitation.  *Id.* at 459.

### viii.  Vilor Shpitalnik, M.D.

Dr. Vilor Shpitalnik, a psychiatrist, conducted an initial psychiatric evaluation of Williams on May 14, 2018.  *Id.* at 808, 810.  According to Dr. Shpitalnik's notes, Williams reported:

12

> Feeling sad[,] having headaches, poor sleep, anxiety and
> fears, nightmares, crying, apprehension, worry, persistent
> at times excruciating physical pain, feelings of
> hopelessness and helplessness, memory problems and
> limited ability to concentrate. . . . She said that the
> accident made her experience constant pain [and] made
> her scared and fearful of stairs.

*Id.* On the Beck Depression inventory, Dr. Shpitalnik rated Williams as severely depressed. *Id.* at 809.[14] Williams indicated that her emotional condition "deteriorated" after her injury on August 30, 2017. *Id.* at 808. Dr. Shpitalnik opined that "within a reasonable degree of medical certainty, the patient's current emotional distress and the accident of August 30, 2017 are causally related." *Id.* at 810.

Williams thereafter saw Dr. Shpitalnik for treatment between June 12, 2018 and August 21, 2019. *Id.* at 811–25. On January 15, 2019 and February 22, 2019, Dr. Shpitalnik noted that Williams displayed "evidence of physical discomfort" and added "major depressive disorder" to her diagnoses. *Id.* at 818, 820. Williams returned to her job as a school safety officer, five days a week, in March 2019 and her mood improved by her appointment on April 15, 2019. *Id.* at 822. Dr. Shpitalnik noted that "[h]er sleep [was] somewhat better. She [was] highly motivated to continue working." *Id.* Dr. Shpitalnik removed "major depressive

---

[14] The Beck Depression Inventory is a self-reporting questionnaire that gauges an individual's symptoms of depression. *Beck Depression Inventory (BDI)*, AMERICAN PSYCHOLOGICAL ASSOCIATION, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression (last updated June 2020) (last visited March 14, 2022).

disorder" from her diagnoses.  *Id.*  However, Dr. Shpitalnik reported on June 25, 2019 that Williams' psychological condition "remained unstable" and he added "major depressive disorder, single episode, unspecified degree" to her diagnoses.  *Id*. at 823.  Consistently throughout his treatment notes, Dr. Shpitalnik observed that Williams' short-term memory and concentration were only "fair."  *Id*. at 811–25.

### b. Opinion Evidence

#### i.  Dr. Tara Brass – Workers' Compensation Psychiatric Examiner

Dr. Tara Brass, a psychiatrist, examined Williams on August 30, 2017 in relation to her claim for workers' compensation benefits.  *Id*. at 392.  Dr. Brass opined that Williams has a "mild, partial work-related disability" and that she could "return to work on a part-time basis (*i.e.*, four hours a day, five days a week) to minimize stress."  *Id*. at 394.

#### ii.  Dr. John Nikkah – Psychiatric Consultative Examiner

Dr. John Nikkah evaluated Williams on August 2, 2018.  *Id*. at 329.  In reviewing Williams' psychiatric history, Dr. Nikkah noted that Williams had received private psychiatric treatment from Dr. Shpitalnik monthly since June 2018.  *Id*.  Williams reported that her condition had improved since working with Dr. Shpitalnik but that occasionally she still experienced symptoms.  *Id*.  At this time, Williams reported difficulty falling asleep due to her pain, recent loss of appetite, and depressive symptoms including "dysphoric moods, loss of usual interests, irritability, fatigue, concentration difficulties, diminished sense of pleasure, and social withdrawal," though she could not provide the frequency or

14

duration of her symptoms. *Id.* at 329–30. In his Medical Source Statement, Dr. Nikkah reported that Williams evidenced no limitation on her "ability to understand, remember, and apply simple directions and instructions." *Id.* at 332. According to Dr. Nikkah, Williams had mild limitations in her "ability to understand, remember, and apply complex directions and instructions, use reason and judgment to make work-related decisions, interact adequately with supervisors, co-workers, and the public, sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work." *Id.* Dr. Nikkah also reported that Williams was limited in her ability to "regulate emotions, control behavior, and maintain well-being." *Id.* However, Dr. Nikkah concluded that Williams' difficulties were "caused by fatigue, distractibility, and a lack of motivation," and that they "[did] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." *Id.*

### iii. Dr. Allen Meisel – Internal Medicine Consultative Examiner

On August 2, 2018, Dr. Allen Meisel performed an internal medicine evaluation on Williams. *Id.* at 334. Williams presented with right ankle pain, left knee pain, right wrist pain, and depression with anxiety. *Id.* Dr. Meisel reported that Williams was continuing physical therapy and that she had increased flexibility in her right ankle, but that she had increased left knee pain following her right ankle surgery. *Id.* At that time, Williams rated her right ankle pain at a level of 8 out of 10, her left knee pain as 6 out of 10, both reducing to 3 out of 10 with medication. *Id.* Dr. Meisel rated Williams' right upper extremity strength as 5/5

proximally and 3/5 distally. *Id.* at 337. Williams' right grip strength was rated at 3/5 and Dr. Meisel noted that she could "zip, button, and tie with both hands." *Id.*

Williams reported that she could walk using a cane beginning in August 2017 and could walk two and a half blocks at a time. *Id.* at 334. She could walk up the two flights of stairs to her apartment, resting each half-flight. *Id.* She could not use the public transportation system. *Id.* Dr. Meisel observed Williams' right ankle and left knee as swollen and tender. *Id.* at 336. According to Dr. Meisel, the torn tendons in Williams' right wrist improved without surgery and an X-ray of her left knee appeared normal. *Id.* at 334; 337. Dr. Meisel noted her gait as normal. *Id.* at 33. Dr. Meisel concluded that she had "mild limitations of standing, walking, climbing stairs, bending, and kneeling" as well as "mild limitations of handling objects, fingering, feeling, pushing and pulling with her right arm." *Id.* at 337.

### iv. Drs. H. Khurana and P. Kennedy-Walsh – State Agency Medical Consultants

The State agency physical consultant Dr. H. Khurana reviewed the administrative record on September 5, 2018. *Id.* at 72. Dr. Khurana determined that Williams had "mild limitations of standing, walking, climbing stairs, bending, and kneeling. She has mild limitations of handling objects, fingering, feeling, pushing and pulling with her right arm." *Id.* at 69. Specifically, Dr. Khurana found that Williams had limitations in her right hand, and as a result could only use her right hand for gross manipulation "occasionally." *Id.* at 71. The State agency psychological consultant Dr. P. Kennedy-Walsh reviewed the administrative record on August 10, 2018. *Id.* at 67–69. Dr. Kennedy-Walsh found that Williams had

mild limitations on her ability to interact with others and concentrate, persist, or maintain pace.  *Id*. at 68.

### 3. ALJ Hearing

On October 7, 2019, Williams, represented by non-attorney representative Shailen Vazirani, appeared before the ALJ.  *Id*. at 37.  The ALJ clarified that Williams had returned to work for three months prior to her hearing, from March until June 2019.  *Id*. at 42.

Williams testified that she had a high school education and had worked as a secretary for the United Federation of Teachers before beginning her job as a school safety officer in August 2009.  *Id*. at 43.  When Williams worked as a secretary, her job required filing, copy-making, faxing, creating media kits for workshops, and coordinating shipping with mail services, requiring approximately 6 hours on her feet out of an 8-hour workday.  *Id*. at 45.  Her job as a school safety officer required patrolling inside and outside of schools, breaking up fights, x-raying, hand-wanding, making arrests, signing people in, and requesting identification.  *Id*. at 44.  As a school safety officer, Williams was on her feet for approximately 7 out of 8 hours of the working day.  *Id*.  In both her secretarial and school safety officer positions, she was at most required to lift approximately 40 pounds.  *Id*. at 44–45.

Williams described her injury in August 2017, when she fell down the stairs at work and injured her right ankle, left knee, right wrist, and right knee.  *Id*. at 46.  Williams rated her pain in her left knee at a level of 9 out of 10 at the time of her hearing.  *Id*.  She stated that the pain had not improved since her knee surgery in

October of 2018.  *Id.* at 48–49.  Williams rated her pain in her right ankle as a 7 out of 10 at the time of her hearing but noted that her pain had improved since her right ankle surgery in January of 2018.  *Id.* at 47.  Williams rated her pain in her right wrist at a level of 7 out of 10, and clarified that she is right-handed.  *Id.*  She explained that she would be unable to pick up a gallon of milk and that she is unable to complete "a lot" of chores due to her right wrist injury.  *Id.* at 48. Williams attended the hearing wearing a wrist brace and testified that she could lift a coffee cup without pain.  *Id.* at 48.  She made an inaudible statement of her rating of the pain in her right knee.  *Id.*

Although Williams participated in physical therapy, she stated that it did not help with her pain.  *Id.* at 49.  She could not continue with physical therapy because it was not covered by her insurance or workers' compensation.  *Id.*  Williams clarified that she had received injections in her left knee, but that the injections did not help with her pain, and so she elected to undergo surgery.  *Id.*

In addition to her physical ailments, Williams testified that she suffers from depression and anxiety, for which she sees Dr. Shpitalnik monthly.  *Id.* 51.  Dr. Shpitalnik had prescribed her Duloxetine for the same.  *Id.*

Williams testified that she lived in an apartment with her two sons, aged 14 and 22, at the time of the hearing.  *Id.* at 49–50.  Her older son does most of the household chores such as cooking, cleaning, laundry, and grocery shopping.  *Id.* at 50.  Williams testified that she cannot sit for more than 15 to 20 minutes without experiencing pain in her lower back, nor can she walk more than two blocks without

needing to rest.  *Id.* at 50.  She uses a cane to support her walking and balancing.  *Id.* at 50.  Williams asked to stand part way through her hearing examination.  *Id.* at 55.

Williams returned to work as a school safety officer in March 2019 and was provided a sitting post but left the job because she could not tolerate the extended sitting.  *Id.* at 52.  In response to a question from the ALJ, Williams stated that she has had trouble sitting for long durations since she was injured in August 2017 and since she filed her claim .  *Id.* at 53.  The ALJ then noted that in a function report dated July 9, 2018, Williams had reported that she had "NO PROBLEM" in her ability to sit.  *Id.* at 53–54; 219.  In further response to this line of inquiry, Williams clarified that her inability to sit was a consequential injury that had worsened over time.  *Id.* at 53–54.

The ALJ also asked Williams to clarify the inconsistency between her testimony regarding the pain in her right wrist and her then-recent medical records from Livingston Physical Medicine, where her right wrist pain was noted as resolved with only occasional stiffness and clicking.  *Id.* at 54.  Williams clarified that she does not require surgery on her wrist and that the physical therapy has helped her pain, but that she remains unable to lift heavy objects.  *Id.* at 55.

Williams testified that for some time she received workers' compensation for her right wrist, left knee, and right ankle, but that she did not receive workers' compensation payments anymore.  *Id.* at 55.

19

The ALJ then questioned vocational expert Matthew C. Lampley. *Id.* at 58. The ALJ asked Lampley to assume a hypothetical person of Williams' age, educational level, and work experience with the following abilities and limitations:

> Limited to the sedentary exertional level in terms of her ability to stand and walk but can lift and carry at the light exertional level. Can only occasionally utilize her lower extremities for pushing, pulling, and operation of foot controls. Could only occasionally utilize her dominant and right upper extremity for pushing or pulling. Can only occasionally climb ramps or stairs, balance and stoop. Is precluded from climbing ladders, ropes or scaffolds and from kneeling, crouching, and crawling. Can engage in no more frequent use of her dominant right upper extremity for gross manipulation; that is[,] for handling of objects. Is required to avoid concentrated exposure to unprotected heights and hazardous machinery and is limited to[,] as a result of her impairments and symptoms[,] to performing simple, routine, and repetitive tasks.

*Id.* at 58–59.

Lampley confirmed that given the abilities and limitations provided, a hypothetical individual in Williams' position could not perform either of her previous jobs as a secretary or school safety officer. *Id.* at 59. Lampley gave three examples of unskilled sedentary jobs that the hypothetical individual could hold: addressing clerk, document preparer, and table worker. *Id.* at 59.

The ALJ posed a second hypothetical, adding the limitation that the hypothetical individual utilized a cane when walking more than short distances. *Id.* at 60. Lampley responded that this limitation would reduce the number of jobs available by approximately 50 percent. *Id.* at 60. The ALJ posed a third hypothetical, incorporating the facts of the prior two, and adding a limitation that

the hypothetical individual could utilize her dominant right upper extremity for gross manipulation on no more than an occasional basis. *Id.* Lampley responded that there would be "no work" for such an individual. *Id.* at 61.

According to Lampley, an employer would not tolerate an unskilled full-time employee to be off-task for more than ten percent of their time, and would tolerate no more than one day per calendar year as an impairment related absence. *Id.* at 61. Following the vocational expert's testimony, Williams' counsel referred to Dr. Meisel's consultative exam, which noted a grip strength of 3 out of 5, thus limiting Williams to only occasional handling and fingering.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are

gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 2022 WL 18502, at *2 (2d Cir. Jan. 3, 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). "'[T]he ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim.'" *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021 WL 5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No. 15-CV-144 (WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016); *see also Milliken v. Saul*, No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17, 2021) ("A 'closed

period' of disability occurs where a claimant is found by the Commissioner to be disabled for a finite period of time which began and ended prior to the date of the agency's administrative determination of disability.").

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id*. (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner

moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).

If the claimant alleges a mental impairment, the Commissioner must apply a "special technique" to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three.  *See* 20 C.F.R §§ 404.1520a, 416.920a; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  "If the claimant is found to have a 'medically determinable mental impairment,' the [Commisioner] must 'specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s),' then 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Sections 404.1520a, 416.920a],' which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation."  *Velasquez v. Kijakazi*, No. 19-CV-9303 (DF), 2021 WL 4392986, at *18 (S.D.N.Y. Sept. 24, 2021) (quoting 20 C.F.R. §§ 404.1520a(b), (c)(3); *id.* §§ 416.920a(b), (c)(3)).  "The functional limitations for these first three areas are rated on a five-point scale of none, mild, moderate, marked, or extreme, and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scaled of none, one or two, three, or four or more."  *Id.* (cleaned up).  If the claimant's impairment does not meet or equal a listed impairment, then the Commissioner continues to the fourth

step and determines whether the claimant has the residual functional capacity

("RFC") to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).

Finally, if the claimant does not have the RFC to perform past relevant work, the

Commissioner completes the fifth step and ascertains whether the claimant

possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and

develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at

111.  Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§

404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant

adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c.  Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at \*14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation marks omitted).  For SSI and SSDI applications filed prior to March 27, 2017, SSA regulations set forth the "treating physician rule," which required an ALJ to give more weight to the opinions of physicians with the most significant clinical relationship with the plaintiff.  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2); *see also, e.g., Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Under the treating physician rule, an ALJ was required to give "good reasons," 20 C.F.R. § 404.1527(c)(2), if she determined that a treating physician's opinion was not entitled to "controlling weight," or at least "more weight," than the opinions of non-treating and non-examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000).  In addition, a consultative physician's opinion was generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

However, in January 2017, the SSA revised its regulations regarding the evaluation of medical opinion for claims filed on or after March 27, 2017 (such as Williams' claim in this case).  *See* REVISIONS TO THE RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  "In implementing new regulations, the SSA has apparently sought to move away from a perceived hierarchy of medical sources."  *Velasquez*, 2021 WL 4392986, at \*19 (citing 82 Fed. Reg. 5844).  The new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a

claimant's] medical sources." *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)). "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors': (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416 920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies. 20 C.F.R. §§ 404.1520c(a)–(b), 416 920c(a)–(b). Under the new regulations, the ALJ must "explain how [he] considered" both the supportability and consistency factors, as they are "the most important factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Amber H. v. Saul*, No. 20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) (two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed foundation of treating physician rule). With respect to the supportability factor, "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Vellone v. Saul*, No. 20-CV-261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404 1520c(c)(1), 416.920c(c)(1)), *adopted sub nom. Vellone on behalf of Vellone v. Saul*, 2021 WL 2891138 (July 6, 2021). Consistency, on the other hand, "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Id.* (citing 20 C.F.R. §§

29

404.1520c(c)(2), 416.920c(c)(2)); *see generally* 42 U.S.C. § 423(d)(5)(B) (requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but need not explicitly discuss, the three remaining factors (relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion). *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Where, however, the ALJ has found two or more medical opinions to be equally supported and consistent with the record, but not exactly the same, the ALJ must articulate how [she] considered those three remaining factors." *Velasquez*, 2021 WL 4392986, at *20 (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)).

Courts considering the application of the new regulations have concluded that "the factors are very similar to the analysis under the old [treating physician] rule." *Id.* (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (report and recommendation) (collecting cases considering new regulations and concluding that "the essence" of the treating physician rule "remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar"). "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by well-accepted medical evidence and *not inconsistent* with the rest of the record before controlling weight could be assigned." *Acosta Cuevas*, 2021 WL 363682, at *9; *see also e.g.,*

*Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were foundation of treating physician rule); *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-1718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide discussion of supportability and consistency of two medical opinions and explaining that ALJ may not merely state that examining physician's opinion is inconsistent with overall medical evidence).

Importantly, "an ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d at 265). However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d.  Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still,

an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other

> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing Social Security Ruling ("SSR") 96-7p, 1996

WL 374186, at *3 (SSA July 2, 1996)).

### B. The ALJ's Decision

On November 27, 2019, in a 13-page decision, the ALJ determined that

Williams was not disabled from August 30, 2017 through the date of the decision.

AR at 17–29. At step one of the five-step inquiry, the ALJ found that Williams had

not engaged in substantial gainful activity since her injury on August 30, 2017. *Id.*

at 19. At step two, the ALJ found that Williams had the following severe

impairments: "right ankle tear and derangement status-post surgical repair, left

knee tear status-post surgical repair, right knee degenerative changes, right wrist

tear and tendinitis, obesity, adjustment disorder, and affective disorder." *Id.* The

ALJ determined that in combination, these impairments "significantly limit

Williams' ability to perform basic work activities." *Id.* at 20. At step three, after

considering Williams' physical and mental impairments, and applying the required

"special technique" for assessing her mental impairments, the ALJ concluded that

Williams did not have "an impairment or combination of impairments" that met the

severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix

1.  *Id.* at 20–22.  In so deciding, the ALJ relied primarily on Williams' statements in her function report, contrasted with the consultative examination opinion of Dr. Nikkah, as well as the treatment notes of Dr. Shpitalnik.  *Id.* at 20–22.  The ALJ concluded that Williams did not have at least two "marked limitations" or one "extreme limitation" and therefore failed to satisfy the "paragraph B" criteria.  *Id.*[15]

Prior to evaluating step four, the ALJ determined Williams' RFC.  To do so, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  *Id.*  The ALJ found that while Williams' medically determinable impairments could reasonably have been expected to cause certain of her alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record[.]"  *Id.* at 23.  The ALJ noted that while Williams alleged pain and difficulty walking, sleeping, lifting, standing, climbing stairs, kneeling squatting, using her hands, and completing tasks, she nonetheless attends to her personal hygiene, cares for her son, prepares simple meals, performs light cleaning, and shops in stores.  *Id.* at 24.

The ALJ then assessed the medical evidence, including Williams' X-Ray and MRI records, treatment notes, and surgical records as well as the opinion evidence from the consultative examiners.  *Id.* at 23–25.  The ALJ found the opinion of state

---

[15]  The ALJ also concluded that the evidence failed to establish the presence of "paragraph C" criteria.  *Id.* at 22.

agency consultant Dr. Khurana to be "in most respects persuasive" as to Williams'
physical limitations. *Id*. at 26. Dr. Khurana opined that Williams could "perform
light exertional work; occasionally push/pull with the right upper and lower
extremities; occasionally climb ramps/stairs; never climb ladders, ropes, or scaffolds;
occasionally balance, stoop, kneel, crouch, and crawl; occasionally handle with the
right upper extremity; and avoid concentrated exposure to hazards." *Id*. The ALJ
found that Dr. Khurana's opinion was supported by and generally consistent with
the record. *Id*. at 25–26. However, the ALJ determined that Dr. Khurana's opinion
was unpersuasive in two respects: Williams had greater exertional limitations than
those identified by Dr. Khurana, and Dr. Khurana's opinion "overstate[d]" the
extent of Williams' right upper extremity limitations. *Id*. at 26. To the latter point,
the ALJ considered Dr. Meisel's opinion that Williams' right upper extremity
impairment was "resolving" and only mildly limiting, as well as physical therapy
records indicating that Williams' wrist injury had "much improved and only [gave]
her occasional stiffness and clicking" with "no recent dropping of objects." *Id*.

Next, the ALJ considered Dr. Meisel's opinion that Williams had "mild
limitations of standing, walking, climbing stairs, bending, and kneeling," and "mild
limitations of handling objects, fingering, feeling, pushing and pulling with her
right jam." *Id*. The ALJ found this opinion to be "generally persuasive" as it was
supported by Dr. Meisel's objective findings and consistent with evidence in the
record, including Williams' physical therapy treatment notes and the fact that she
returned to work for three months. *Id*. However, the ALJ found that Williams'

postural limitation went beyond that stated in Dr. Meisel's opinion, considering her obesity and giving her the benefit of the doubt. *Id.*

The ALJ found "persuasive" the several workers' compensation opinions in the record declaring that Williams could return to work at the sedentary exertional level. *Id.* The ALJ determined that the opinions were supported by physical exams indicating decreased range of motion and strength and consistent with evidence in the record noting recovery, normal strength and gait at times, and Williams' ability to return to work for three months. *Id.* at 26.

With respect to Williams' mental state, the ALJ found consultative examiner Dr. Nikkah's opinion to be "persuasive." *Id.* In his opinion, Williams was:

> mildly limited in the ability to understand, remember, and apply complex directions and instructions; use reason and judgment to make work-related decisions, interact adequately with supervisors, co-workers, and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; and regulate emotions, control behavior, and maintain well-being. She demonstrates no evidence of limitation in the ability to maintain personal hygiene and appropriate attire or be aware of normal hazards and take appropriate precautions.

*Id.* The ALJ determined that Dr. Nikkah's opinion was supported by his objective findings and consistent with Williams' "conservative" treatment record and statements regarding her daily living. *Id.* However, in an effort to give Williams the benefit of the doubt and considering her statements of ongoing symptoms and treatment notes prescribing medication, the ALJ found that Williams' limitations extended beyond those determined by Dr. Nikkah. *Id.*

Finally, the ALJ considered the opinion of the state agency consultant Dr. Kennedy-Walsh, who found that Williams' mental limitations were non-severe. *Id.* at 27. The ALJ found Dr. Kennedy-Walsh's opinion "somewhat persuasive" in that it was supported by and consistent with Williams' activities of daily living. *Id.* The ALJ again found, however, that Williams' limitations extended beyond those in Dr. Kennedy-Walsh's opinion, considering Williams' testimony that her symptoms persisted despite medication. *Id.*

Based on this analysis, the ALJ found that Williams had the RFC to perform sedentary work (as defined under 20 C.F.R. § 404.1567(a)) with certain limitations:

> the claimant can lift/carry at light exertional level; occasionally use her lower extremity for pushing, pulling and operation of foot controls; occasionally use the dominant right upper extremity for pushing or pulling; occasionally climb ramps/stairs; occasionally balance and stoop; never climb ladders, ropes, or scaffolds; never kneel, crouch, or crawl; frequently use the dominant right hand for handling objects; and is required to avoid concentrated exposure to unprotected heights and hazardous machinery. The claimant is also limited to performing simple, routine, and repetitive tasks, and requires the use of a cane for ambulation.

*Id.* at 22. In justifying the RFC, the ALJ found that inconsistencies between Williams' subjective allegations and other evidence in the record undermined the credibility of her statements. *Id.* at 27. Specifically, the ALJ noted that while Williams testified to an extreme limitation on her ability to sit throughout the period of alleged disability, this limitation is not recorded in her medical file and is expressly contradicted by Williams' own function report. *Id.* at 27–28. Additionally,

the ALJ found that Williams had made inconsistent statements regarding the benefits of her physical therapy on her right upper extremity limitation. *Id*. at 28.

At step four, the ALJ found that Williams was unable to perform any past relevant work. *Id*. at 28. At step five, after considering the vocational expert's testimony, the ALJ found that Williams could perform jobs, such as addressing clerk, document preparer, and table worker, that exist in significant numbers in the national economy. *Id*. at 29. Accordingly, the ALJ concluded that Williams was not disabled from August 30, 2017 through the date of the decision. *Id*. at 29.

### C. Analysis

Williams argues that the Commissioner's decision should be reversed and remanded because (1) the ALJ's RFC assessment was not supported by substantial evidence; (2) the ALJ erred by relying on vocational expert testimony in conflict with SSR 96-9p; (3) the ALJ failed to evaluate Williams' mental impairment and resulting functional limitations; (4) the ALJ failed to consider that Williams' persistent efforts to obtain treatment for pain and other symptoms enhances her credibility, as recognized in SSR 16-3p; (5) the ALJ did not consider the possible side effects Williams' medications posed on her functional limitations; (6) the RFC analysis does not include all supported limitations; and (7) the vocational expert's testimony is based on an RFC that does not include all supported limitations. Pl. Mem. at 18–26.[16] The Commissioner responds that the ALJ's decision should be

---

[16] The page numbers refer to the page numbers produced by the Electronic Case Filing ("ECF") System, not the table of contents in Williams' memorandum.

affirmed because (1) the ALJ properly evaluated Williams' mental limitations; (2) the ALJ's RFC determination is supported by substantial evidence; (3) the ALJ properly evaluated Williams' subjective allegations; and (4) the ALJ's step five finding is supported by substantial evidence.  Def. Mem. at 10–25.  For the reasons which follow, Williams' case is remanded because (1) the ALJ failed to fully develop the record, and (2) the RFC finding was not supported by substantial evidence in the record as a whole.

### 1. The ALJ Failed to Fully Develop the Record

As an initial matter, the ALJ failed to fully develop the record regarding Williams' physical and mental impairments.  "The ALJ's duty to develop the record on behalf of a claimant is a threshold duty," and remand is therefore "appropriate when the ALJ fails to discharge this duty."  *Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (AJN) (KHP), 2021 WL 363682, at *10 (S.D.N.Y. Jan. 29, 2021) (report and recommendation).  Moreover,  remand is appropriate where an ALJ fails to fill "obvious gaps" in the administrative record.  *See Brooks v. Kijakazi*, No. 20-CV-7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022), *adopted by* 2022 WL 715424 (Mar. 10, 2022); *Wilson v. Colvin*, 107 F. Supp. 3d 387, 403 (S.D.N.Y. 2015) ("The ALJ has an affirmative duty to fill any obvious gaps in the administrative record prior to rejecting a treating physician's opinion.").

Even under the new SSA regulations, an ALJ must make "every reasonable effort" to obtain from an individual's treating health care provider all medical evidence necessary to properly make a disability determination.  *Starr v. Comm'r of*

*Soc. Sec.*, No. 20-CV-4484 (GWG), 2022 WL 220408, at *5 (S.D.N.Y. Jan. 26, 2022);

*Byrd v. Kijakazi*, No. 20-CV-4464 (JPO) (SLC), 2021 WL 5828021, at *22 (S.D.N.Y.

Nov. 12, 2021), *adopted by* 2021 WL 5827636 (Dec. 7, 2021). "As part of that

obligation, an ALJ must attempt to obtain medical opinions – not just medical

records – from a claimant's treating physicians." *Skartados v. Comm'r of Soc. Sec.*,

No. 20-CV-3909 (PKC), 2022 WL 409701, at*4 (E.D.N.Y. Feb. 10, 2022) (citing

*Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *10–11

(S.D.N.Y. Aug. 6, 2011) (collecting cases)). Accordingly, "an ALJ must make an

initial request for medical opinions and, if no opinion is received, make a follow-up

request between 10 and 20 days after the initial request." *Id.*; *see also Starr*, 2022

WL 220408, at *5. Remandis warranted where the ALJ fails to obtain an opinion

from the claimant's treating physician if the ALJ could not have reached an

informed decision otherwise. *Russ v. Comm'r of Soc. Sec.*, No. 20-CV-6389 (RWL),

2022 WL 278657, at *8 (S.D.N.Y. Jan. 31, 2022).

Specifically, when an ALJ has to determine an RFC, his failure to request a

functional assessment when no such assessment exists in the record or when any

such assessments are insufficient constitutes a failure of his duty to develop the

record. *See, e.g., Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248 (KHP), 2020 WL

3412936, at *13 (S.D.N.Y. June 22, 2020) (collecting cases); *see also Acosta Cuevas*,

2021 WL 363682, at *11 (applying same principle in post-treating physician rule

context). Indeed, despite the new regulations, an ALJ's duty to develop the record

"takes on heightened importance with respect to a claimant's treating medical

sources, because those sources 'are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.'" *Romero*, 2020 WL 3412936, at *12 (quoting *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20 C.F.R. § 416.927(c)(2))).

When an ALJ's RFC determination is questioned by a claimant, a reviewing court's "decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Newton v. Berryhill*, No. 18-CV-1244 (MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019) (quoting *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015)); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (ALJ required to seek out additional evidence when there are "obvious gaps" in administrative record).

### a. The ALJ Failed to Develop the Record With Respect to Williams' Physical Impairments

Here, the only functional assessments in the record regarding Williams' physical impairments were from consultative examiners Dr. Meisel, who examined Williams in August 2018, and Dr. Khurana, who did not examine Williams at all. AR at 64–72, 334.  There are no functional assessments from any of the healthcare providers, such as Drs. Persich, Kaplan, or Scilari, who treated Williams' physical impairments on a consistent basis, and there is no evidence in the record that the

41

ALJ attempted to seek medical opinions from these providers.  Moreover, the consultative examiners' functional assessments were completed more than a year before the October 2019 hearing, and therefore do not reflect the progression of Williams' impairments, such as the development of her lower back pain.  *See e.g., id.* at 449, 456.

Without the benefit of a functional assessment of Williams' physical impairments by a treating healthcare provider, the ALJ's RFC determination was based largely on his own interpretation of the medical records and treatment notes. Indeed, the ALJ himself acknowledged that aside from Dr. Meisel's opinion and the medical records, "there is little else in the record regarding [Williams'] physical impairments."  *Id.* at 24.  An ALJ commits legal error when, as here, he "fill[s] th[e] evidentiary void with his own medical judgment and interpretation of [the medical] records."  *Lee v. Saul*, No. 19-CV-9451 (CS) (JCM), 2020 WL 5362619, at *17 (S.D.N.Y. Sept. 8, 2020) (collecting cases); *see also Dean C. v. Comm'r of Soc. Sec.*, No. 19-CV-1165 (DB), 2021 WL 155801, at *8 (W.D.N.Y. Apr. 21, 2021) (ALJ not permitted to use own  interpretation of record to develop claimant's physical RFC).

The lack of functional assessments from Williams' healthcare providers is exacerbated by the fact that many of her medical records contain MRI and X-Ray results, on which the ALJ relied in determining Williams' RFC.  AR at 23.  While some of the treatment notes in the record contain an analysis of some of these results, *see e.g., id.* at 303 (analyzing Williams' right wrist MRI), there is no medical opinion in the record that considers the MRI and X-Ray results in the context of

42

Williams' functional capabilities and limitations.  Without such a medical opinion, the ALJ improperly relied on his own interpretation of these records in developing Williams' RFC.  *See e.g.*, *Alessi v. Colvin*, No. 14-CV-7220 (WFK), 2015 WL 8481883, at *6 (E.D.N.Y. Dec. 9, 2015) ("While the ALJ himself considered the MRIs, the ALJ is not a medical professional who can interpret the MRIs to assess Plaintiffs RFC.").

### b. The ALJ Failed to Develop the Record With Respect to Williams' Mental Impairments

Similarly, with respect to Williams' mental impairments, the only functional assessments in the record were from consultative examiners Dr. Nikkah, who examined Williams in August 2018, and Dr. Brass, who examined Williams in connection with her workers' compensation claim in August 2017.  The duty to develop the record is "particularly important" when a claimant alleges a mental illness. *Vernon v. Saul*, No. 19-CV-10520 (OTW), 2021 WL 1085387, at *14 (S.D.N.Y. Mar. 19, 2021)  (quoting *Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014)).  Notably, Dr. Shpitalnik, Williams' treating psychiatrist, diagnosed her with "major depressive disorder" in January 2019 and several months later indicated that her psychological condition "remained unstable."  *Id.* at 818, 823.  Neither of the psychiatric functional assessments in the record addresses these developments in Williams' mental state or considers how these developments impacted Williams' functional capacity. Therefore, the ALJ's failure to solicit a functional assessment from Dr. Shpitalnik constitutes an obvious gap in the record that requires remand.  *See, e.g., Skartados*, 2022 WL 409701, at *5 (ALJ's failure to obtain medical opinion regarding plaintiff's

functional capacity from treating psychiatrist warranted remand) (citing *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999)).

Moreover, an ALJ's duty to develop the record "encompasses not only the duty to obtain a claimant's medical records and reports, but also the duty to question the claimant about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Starr*, 2022 WL 22048, at *5 (citing *Pena*, 2008 WL 5111317, at *8). During the hearing, the ALJ failed to question Williams about her mental impairments. At the hearing, Williams testified that she experiences depression and anxiety and takes medication to manage her symptoms. AR at 51. The ALJ did not ask any questions about these impairments or their impact on Williams' functional capacity, and his failure to do so constitutes another "obvious gap" in the record. *See, e.g., Starr*, 2022 WL 220408, at *5.

For the foregoing reasons, the ALJ failed to fully develop the record, and therefore remand is appropriate.

## 2. The ALJ's RFC Determination Was Not Supported by Substantial Evidence

The ALJ's failure to fully develop the record renders the RFC unsupported by substantial evidence. *See, e.g., Manzella v. Comm'r of Soc. Sec.*, No. 20-CV-3765 (VEC) (SLC), 2021 WL 5910648, at *15 (S.D.N.Y. Oct. 27, 2021) (ALJ's failure to develop record constituted error in RFC determination) (collecting cases), *adopted by* 2021 WL 5493186 (Nov. 22, 2021). Moreover, courts frequently remand when an ALJ cherry-picks medical evidence in support of an RFC determination while

ignoring or mischaracterizing evidence to the contrary. *Brooks*, 2022 WL 213994, at

*14 (citing *Velasquez*, 2021 WL 4392986, at *27 (collecting cases)). As discussed

below, the ALJ's RFC determination regarding both Williams' physical and mental

impairments was not supported by substantial evidence. These errors provide a

separate basis for remand.

### a. The ALJ's Assessment of Williams' Physical Impairments Was Not Supported by Substantial Evidence

First, the ALJ's RFC finding with respect to Williams' physical impairments

is not supported by substantial evidence in the record. In concluding that Williams

could "frequently" use her dominant right hand for handling objects, the ALJ relied

on Dr. Meisel's opinion, which he found to be "generally persuasive." AR at 26. Dr.

Meisel rated Williams' right upper extremity strength as 5/5 proximally and 3/5

distally and her grip strength as 3/5. *Id.* at 337. Dr. Meisel noted that she could

"zip, button, and tie with both hands." *Id.* However, the ALJ failed to consider that

this opinion was inconsistent with Williams' own statements indicating that she

struggled to dress herself. *Id.* at 215 ("[i]t takes me a while to put on my bra

because of my wrist."). Moreover, in her hearing testimony, Williams stated that

she could lift a cup of coffee without pain, but not a gallon container. *Id.* at 48. The

ALJ discredited this testimony because treatment notes from Williams' physical

therapist described her right wrist injury as "resolved" and noted that Williams

reported improvement. *Id.* at 405. However, during the hearing, Williams testified

that her therapist's use of the term "resolved" meant only that she did not require

surgery for her right wrist, but that she still experienced limitations in her ability to lift objects. *Id.* at 54–55. Therefore, as discussed above, without the benefit of a functional assessment from Williams' physical therapist, the ALJ's determination that Williams' right wrist injury was "resolved" such that she could frequently use her right hand for handling objects amounted to an improper lay interpretation of medical evidence in the record. *See, e.g., McGrath v. Comm'r of Soc. Sec.*, No. 20-CV-3042 (FB), 2021 WL 5281317, at *2 (E.D.N.Y. Nov. 12, 2021) ("Because the ALJ is a layperson, not a doctor, she is not permitted to interpret raw medical information into a determination about [the claimant's] medical condition without the assistance of a medical professional's insight.").

The ALJ also failed to consider that Williams' testimony about her ability to use her right wrist was at least arguably consistent with other evidence in the record. For example, Dr. Khurana found that Williams could only "occasionally handle with the right upper extremity." *Id.* at 26. In addition, between February 2018 and February 2019, Williams' physical therapists reported that Williams' wrist continued to show tenderness and limited mobility. *See id.* at 433–35, 437, 439, 442, 450, 455, 459. Because the ALJ failed to properly consider the consistency between Dr. Meisel's opinion and other evidence in the record, the Court cannot conclude that the ALJ's RFC determination was supported by substantial evidence. *See, e.g., Velasquez*, 2021 WL 4392986, at *27 (remanding when ALJ's inadequate

review and consideration of medical evidence led to improper analysis of supportability and consistency of physician's opinion).[17]

### b. The ALJ's Assessment of Williams' Mental Impairments Was Not Supported by Substantial Evidence

Similarly, the ALJ's RFC finding with respect to Williams' mental impairments was not supported by substantial evidence in the record. In concluding that Williams was "limited to performing simple, routine, and repetitive tasks," *id.* at 22, the ALJ relied on Dr. Nikkah's opinion, which he found to be persuasive. *Id.* at 25. However, Dr. Nikkah's opinion was provided in August 2018, more than a year before the October 2019 hearing, and was rendered before the bulk of Williams' psychiatric treatment with Dr. Shpitalnik. *Id.* at 329, 811–25. Therefore, Dr. Nikkah's opinion did not account for Williams' January 2019 major depressive disorder diagnosis and could not have accounted for almost a year's worth of Williams' psychiatric treatment records. Accordingly, Dr. Nikkah's opinion cannot constitute substantial evidence to support the ALJ's RFC determination.

---

[17] Throughout his decision, the ALJ devoted significant attention to Williams' condition at the time of the state's consultative examinations as compared to her condition at the time of the hearing, approximately one year after her initial injury and near the termination of her treatment. *See* AR at 24–25; 27. Based in large part on the opinions of the consultative examiners and his impressions at the hearing, the ALJ determined that Williams was not disabled. However, the ALJ failed to consider the possibility that Williams' impairments could have satisfied the definition of disability at an earlier (or later) period of time following her injury. Upon remand, the ALJ should consider whether Williams may qualify for a "closed" period of disability. *See, e.g., Milliken*, 2021 WL 1030606, at *9 ("A 'closed period' of disability occurs where a claimant is found by the Commissioner to be disabled for a finite period of time which began and ended prior to the date of the agency's administrative determination of disability.").

*See, e.g., Skartados*, 2022 WL 409701, at *9 (ALJ's mental RFC finding not

supported by substantial evidence when ALJ relied on consultative examiner

opinion that failed to account for one year's worth of medical records); *see also*

*Chambers v. Comm'r of Soc. Sec.*, No. 19-CV-2145 (RWL), 2020 WL 5628052, at *12

(S.D.N.Y. Sept. 21, 2020) (collecting cases).[18]

### 3. The ALJ's Errors Were Not Harmless

The ALJ's failure to fully develop the record and to properly determine

Williams' RFC were not harmless.  Had the ALJ determined Williams' RFC with

greater limitations on her right upper extremity, consistent with the third

hypothetical posed to the vocational expert, the ALJ would have found that there

was "no work" for such an individual and that Williams was therefore disabled.  AR

at 60–61.  Accordingly, the ALJ's failure to properly assess the medical evidence

was not harmless.  *See, e.g., Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN)

(FM), 2015 WL 872105, at *10 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks

and citation omitted) (ALJ's analysis of treating physician's opinion was not

harmless error because vocational expert "essentially testified that if these opinions

were adopted, [the claimant] would be unable to work"), *adopted sub nom. Pines v.*

*Colvin*, 2015 WL 1381524 (Mar. 25, 2015).[19]

---

[18] Williams contends that the ALJ failed to properly document the "special technique" for evaluating mental impairments.  Pl. Mem. at 21.  However, as the Commissioner notes, the ALJ did in fact apply and document the special technique in his decision.  AR at 20–22; *see also* Def. Mem. at 11–13.

[19] Williams also contends that the ALJ erred in assessing the credibility of her subjective statements.  Pl. Mem. at 22–23.  The Court declines to reach this

### III. CONCLUSION

For the foregoing reasons, Williams' motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ should (1) obtain a functional assessment from Williams' treating providers; (2) obtain a functional assessment from Williams' treating psychiatrist, Dr. Vilor Shpitalnik; (3) assess Williams' RFC in light of any additional findings of her physical and mental impairments; (4) if needed, submit additional hypotheticals mirroring Williams' RFC to the vocational expert; and (5) consider whether Williams may qualify for a "closed period" of disability.

**SO ORDERED.**

Dated: March 16, 2022
     New York, New York

JAMES L. COTT
United States Magistrate Judge

---

argument given the other bases for remand.  In any event, on remand, the ALJ should reevaluate the credibility of Williams' subjective statements after further developing the record and assessing her healthcare providers' opinions.

49